**In re: MERIDIA PRODUCTS LIABILITY LITIGATION**

No. 5:02–CV–8000.

United States District Court, N.D. Ohio.

July 7, 2004.

Caroline Catchings Donlon, Law Offices of Daniel E. Becnel, Jr., Reserve, LA, Christina M. Janice, John R. Climaco, Scott D. Simpkins, Climaco Lefkowitz Peca Wilcox & Garofoli, Cleveland, OH, Daniel E. Becnel, Jr., Reserve, LA, Donald F. Hildre, Thomas D. Haklar, Dougherty, Hildre, Dudek & Haklar, San Diego, CA, Jane H. Walker, Jean M. Geoppinger, Louise M. Roselle, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Dianne M. Nast, Roda & Nast, Lancaster, PA, for Plaintiff.

Anne M. Kordas, Tucker Ellis & West, Cleveland, OH, for Defendant.

Leon B. Taranto, Schmeltzer, Aptaker & Shepard PC, Washington, DC, for Movant.

MEMORANDUM AND OPINION,
[Resolving Doc. No. 232, 240,
266, 299, 302]

GWIN, District Judge.

On December 5, 2003, Abbott Laboratories, Abbott Laboratories International Co., Abbott Laboratories Inc., and Knoll Pharmaceutical Co. (collectively "Pharmaceutical Defendants" or "Defendants") moved the Court for summary judgment in the present matter. [Doc. 232] On January 12, 2004, Plaintiffs responded, opposing the motion. [Doc. 264] Defendants replied on January 26, 2004. [Doc. 270]

In a related matter, Defendants move the Court for an order striking the affidavit of Keith Altman [Docs. 266, 269, 280, 299, 302] and for an order excluding Plaintiffs' expert witnesses. [Docs. 240, 261, 271]

For the reasons described below, the Court **GRANTS**, in part, Defendants' motion to exclude the expert testimony of Arnold Schwartz, Ph.D. and **DENIES** as moot Defendants' motion to strike the affidavit of Keith Altman. Ultimately, the Court **GRANTS** Defendants' motion for summary judgment as to all of Plaintiffs' claims against the Pharmaceutical Defendants.

**BACKGROUND**

This action, consolidated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation, involves the diet drug Meridia (a.k.a., Sibutramine Hydrochloride Monohydrate). With their actions, Meridia Plaintiffs allege that their use of Meridia caused cardiovascular and cerebrovascular injuries. The claimed injuries include heart attack, stroke, tachycardia,[1] heart palpitations, chest pain, high blood pressure, hypertension, and death. While Plaintiffs do not describe their injuries in detail, some Plaintiffs allege that their injuries are "serious and permanent." *See e.g., Outlaw v. Abbott Labs., Inc.,* 5:04–cv–8001, compl. at ¶ 29. Other Meridia Plaintiffs allege that the drug was ineffective for weight loss or that they are at increased risk for developing future injury as a result of their ingestion of Meridia.

Abbott Laboratories manufactures, markets, and distributes Meridia within the United States. Before being absorbed by

1. *Webster's Third New International Dictionary* defines this term as "relatively rapid heart action whether physiological or pathological."

Abbott, Defendant Knoll Pharmaceuticals Co. did the same. In this action, the Meridia Plaintiffs sued Knoll Pharmaceutical Co. ("Knoll"), Abbott Laboratories ("Abbott"), BASF Aktiengesellschaft ("BASF AG"), BASF Corp., and SmithKline Beecham Corp., doing business as GlaxoSmithKline.[2] With their amended complaint, the Meridia Plaintiffs state claims for strict product liability, negligence, negligence per se, violation of state consumer protection statutes, breach of express and implied warranties, and medical monitoring. The Meridia Plaintiffs seek to recover damages for deaths and personal injury, refunds, restitution, and equitable relief.

Meridia acts as an anti-obesity medication by slowing the body's dissipation of serotonin, a brain chemical associated with satiety, and norepiniphrine. Around 1980, Boots Pharmaceuticals developed Meridia as an anti-depressant, but never applied for FDA approval as an obesity medication. Boots Pharmaceuticals sold the drug formulation to Knoll. In 1990, Knoll began specifically testing Meridia as a diet drug. On November 22, 1997, the FDA approved the marketing of Meridia in the United States as a diet drug, at dosages of 5, 10, and 15 milligrams. Knoll began marketing Meridia through pharmacies in February 1998. On March 2, 2001, Abbott Laboratories acquired Knoll Pharmaceuticals.

According to Plaintiffs, between November 22, 1997 and September 30, 2000, the FDA received 397 complaint reports from people using Meridia. Those complaints included reports of 152 hospitalized patients and 29 deaths, with 19 of those deaths from cardiovascular causes. On March 19, 2002, the consumer watchdog group Public Citizen petitioned the FDA to remove Meridia from the market.

Litigation followed in both state and federal courts. Responding to the state court actions, Abbott removed a large number of actions to federal court, principally based upon diversity jurisdiction. On August 15, 2002, the Judicial Panel on Multidistrict Litigation ("the MDL Panel") transferred the pending federal cases to this Court for consolidated pretrial proceedings. Subsequently, additional tag-along cases have followed. As the transferee court, this Court now determines if Plaintiffs' claims survive summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In seeking summary judgment, the moving party bears the initial burden of showing an absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir.2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding whether the moving party has met this burden, a court must view the facts and all inferences drawn from them in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, "a complete failure of proof concerning an

---

**2.** Subsequently, this Court dismissed the claims against BASF Corp. and BASF AG. BASF AG is a German company which is the parent corporation for Knoll and BASF Corp.

On March 2, 2001, Abbott Laboratories acquired pharmaceutical divisions of BASF AG, including Knoll Pharmaceutical Company.

essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies this burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *See id.*

A factual dispute stops summary judgment only if it is material, that is, if it relates to a matter essential to adjudication. The dispute must concern facts that, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. The factual dispute also must be genuine. The facts must be such that if proven at trial a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## ANALYSIS

With their motion for summary judgment, the Defendants claim that Plaintiffs do not create a material dispute of fact as to matters essential to Plaintiffs' claims. First, Defendants assert that Plaintiffs fail to offer sufficient evidence to create a material dispute of fact that Meridia causes harm in patients. Second, Defendants argue that their warnings to physicians were sufficient. Third, Defendants claim that Plaintiffs' design defect claim fails because (i) the Plaintiffs do not show material evidence that the risks of Meridia outweigh its benefits, (ii) there was no alternative design, and (iii) one cannot bring a design defect claim against "unavoidably unsafe" products. Fourth, Defendants argue that Plaintiffs have not offered evidence tending to establish a manufacturing defect. Fifth, Defendants state that there is no evidence of negligence per se. Sixth, Defendants assert that there is no material dispute of fact with regard to Plaintiffs' breach of warranty claims. Seventh, Defendants assert that Plaintiffs are unable to create a material dispute of fact with regard to a negligent or fraudulent misrepresentation, either under common law or statutory law. Finally, Defendants argue that Plaintiffs have not offered sufficient evidence to support their medical monitoring claim. If all of Defendants' assertions are true, none of Plaintiffs' claims against the Pharmaceutical Defendants survive summary judgment. The Court will analyze, in turn, the merits of Defendants' assertions.

### I. Causation

In support of their motion for summary judgment, Defendants primarily argue that the Plaintiffs have failed to come forth with any evidence that Meridia causes compensable injury. If Defendants are correct, then Plaintiffs' claims for strict liability (all theories thereof), negligence, and negligence per se must fail. After all, causation of an alleged injury is an element of each of these claims. *See In re Norplant Contraceptive Products Liability Litig.,* 215 F.Supp.2d 795, 830 (E.D.Tex. 2002).

Toxic tort cases present a unique challenge to the classical conception of causation. Other tort cases, such as slip-and-fall or car accident cases, feature scenarios where causation is fairly obvious-if one car collides with another, common sense dictates that a range of injuries from broken limbs to internal bleeding to death can result. Toxic tort cases, however, generally involve less-common injuries that often function at the cellular level. The causation inquiry in toxic tort cases is more complicated because the injuries themselves are usually not immediately obvious and the connection between exposure and injury is not a matter of common sense or everyday experience. Moreover, a variety of exposures frequently can associate with the condition. Using one example, both smoking and exposure to asbestos increase the risk of lung cancer. When smoking and exposure to asbestos combine, the risk of cancer increases precipitously. Similarly, Meridia users are typically obese, a condition that, alone, is a risk factor for cardiovascular disease. When cardiovascular injury occurs, it is difficult to precisely identify the precipitating cause.

■ In toxic tort cases, the causation inquiry is two-pronged. First, a plaintiff must show that the substance to which she was exposed *can cause* the type of injury alleged. Next, a plaintiff must show that in her case, exposure to the substance *actually caused* the alleged injury. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir.1988); *Bonner v. ISP Techs. Inc.*, 259 F.3d 924, 928 (8th Cir.2001) ("[t]o prove causation in a toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury"); *In re Breast Implant Litig.*, 11 F.Supp.2d 1217, 1224 (D.Colo.1998) (collecting cases). The first prong is called "generic" or "general"

causation; the second goes by the moniker "specific" or "individual" causation. *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1129 (9th Cir.2002) (" 'Generic causation' has typically been understood to mean the capacity of a toxic agent ... to cause the illnesses complained of by plaintiffs. If such capacity is established, 'individual causation' answers whether that toxic agent actually caused a particular plaintiff's illness."); *Jack v. Glaxo Wellcome, Inc.*, 239 F.Supp.2d 1308, 1320–21 (N.D.Ga.2002) ("General causation is the capacity of a product to cause injury; specific causation is proof that the product in question caused the injury of which the plaintiff complains.") (citation omitted). *See also Goebel v. Denver & Rio Grande Western Ry. Co.*, 346 F.3d 987, 990 (10th Cir.2003) (identifying "two separate aspects of causation ... in this case: (1) general causation, meaning that the particular circumstances in the tunnel *could* have caused Mr. Goebel's injury, and (2) specific causation, meaning that those circumstances *did in fact* cause Mr. Goebel's injury.")

■ With a large number of discrete clinical settings associated with each plaintiff's claims, the examination regarding individual causation is unwieldy. The more appropriate course restricts the inquiry on consolidated motions for summary judgment to the logically prior issue, general causation. Multidistrict Litigation ("MDL") seeks to promote judicial economy and litigant efficiency by allowing the transferee court to preside over matters common among all cases. Given this function, the transferee court typically does not rule on cumbersome, case-specific legal issues. *Cf. Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 220, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (noting that the transferee court dealt with "consolidated procedures on common issues of liability.").

By its nature, specific causation is not common to all plaintiffs. Rather, it involves a "determination [that] is highly individualistic, and depends upon the characteristics of individual plaintiffs." *In re "Agent Orange" Product Liab. Litig., MDL No. 381*, 818 F.2d 145, 165 (2d Cir.1987). Therefore, the Court limits its inquiry to general causation, i.e., whether the plaintiff shows sufficient evidence that the substance in question has the capacity to cause harm. Indeed, other MDL cases have reserved specific causation questions to cases that are remanded. *See Schmerling v. Danek Med., Inc.*, No. 96–2749, 1999 U.S. Dist. LEXIS 13952, 1999 WL 712591 (E.D.Pa. Sept. 10, 1999) (on remand from MDL, the court found insufficient evidence of specific causation to survive summary judgment).

The Court first turns to examining whether the Plaintiffs show sufficient evidence that Meridia is capable of causing compensable injury. Because the Court examines this case on a motion for summary judgment, the issue may be better phrased, "Have Plaintiffs offered sufficient evidence that Meridia causes the types of injuries of which they complain?" If the answer to this question is negative, it stops plaintiffs from demonstrating specific causation. *See Soldo v. Sandoz Pharm. Corp.*, 244 F.Supp.2d 434, 525 (W.D.Pa. 2003) ("The issue of specific causation is material, however, only if plaintiff can demonstrate general causation . . .") (quoting *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F.Supp.2d 1153, 1155 (D.Mont.1999)).

For Defendants, Meridia operates safely and effectively, and has few serious side effects. More critical for the issues presently before this Court, the Defendants claim that Plaintiffs show no evidence sufficient to make out a case that Meridia causes compensable injury. Supporting this conclusion, Defendants cite the opinions of numerous scientific and medical experts, as well as epidemiological studies. Restating their argument: The obese population using Meridia suffer from increased risk of cardiovascular conditions. Unless epidemiological studies show this risk increases with Meridia ingestion, there is no way to attribute the condition to the Meridia use.

Plaintiffs do not respond with epidemiological studies of their own. Instead, they primarily offer three arguments. First, Plaintiffs rely on the opinion testimony of their expert, Arnold Schwartz, Ph.D, D.Sci (Hon), R.Ph, FACC, FAHA. Schwartz finds Meridia causes increases in heart rate and blood pressure, which lead to adverse cardiac events. Further, Schwartz says Meridia causes little beneficial weight loss. Second, Plaintiffs rely on a proportional reporting rate (PRR) analysis performed by Keith Altman, Ph.D. Plaintiffs provide data regarding allegedly greater incidence of cardiovascular reports with Meridia, when compared to other types of adverse event reports. Plaintiffs argue that the data establishes that Meridia causes harmful cardiovascular events. Finally, Plaintiffs argue that the Meridia product inserts given to both doctors and patients state that Meridia can cause injury. To Plaintiffs, this constitutes an admission of Meridia's harmful propensities. As evidence of a further admission, Plaintiffs point to internal company adverse report records in which Abbott and Knoll themselves conclude that Meridia "probably" or "possibly" caused various Meridia patients' adverse events.

The Court examines Plaintiffs' three arguments on general causation *seriatim.* As a threshold matter, the Court first determines the form evidence need take to establish a material issue of fact. The Court then reviews each of Plaintiffs' attempts to create a material dispute of fact with regard to causation.

## A. Epidemiological Evidence and Expert Testimony

Defendants argue that Plaintiffs must present this Court with experts who can present epidemiological evidence to establish that Meridia doubles the risk of harm of compensable injuries. The Court examines the merits of this argument.

Generally, "[e]pidemiologists compare rates of disease in various populations to determine whether there is an increased risk of disease in those who used a particular substance in comparison to non-users." *In re Diet Drugs Products Liab. Litig.*, MDL No. 1203, 2000 U.S. Dist. LEXIS 9661, CCH Prod. Liab. Rep. p15, 855 (E.D. Pa June 28, 2000). It is notable that Plaintiffs need not prove disease to establish compensable injury. The *Restatement (Second) of Torts* § 7 states:

> "Harm" implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object or thing. Physical changes or alterations may be either beneficial, detrimental or of no consequence to a person. In so far as physical changes have a detrimental effect on a person, that person suffers harm.

RESTATEMENT (SECOND) OF TORTS § 7, cmt. b. Thus, Plaintiffs may create a material dispute of fact with regard to tortious conduct without necessarily proffering evidence of cardiovascular disease.

In establishing a causal chain, epidemiological evidence is just one method of proof. Defendants correctly argue that some courts express a preference for epidemiological evidence. However, such evidence is not mandatory: "Epidemiologic studies are the primary generally accepted methodology for demonstrating a causal relation between the chemical compound and a set of symptoms or a disease. When an expert does not rely on the primary methodology for establishing causation, then that places a burden on the expert to

explain his choice of methodologies ..." *Conde v. Velsicol Chem. Corp.*, 804 F.Supp. 972, 1025–26 (S.D.Ohio 1992). The Western District of Pennsylvania, while also observing its preference for epidemiological evidence, noted: "This does not mean that conclusive published epidemiologic studies are required in every case alleging cause and effect. In this case, however, other types of evidence upon which plaintiff might reasonably rely are equally absent." *Soldo*, 244 F.Supp.2d at 536 (W.D.Pa.2003).

No requirement exists that a party *must* offer epidemiological evidence to establish causation. Plaintiff's burden of establishing causation "does not necessarily require them to produce scientific studies[.]" *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 745 (11th Cir.1986). The D.C. Circuit clarified this area of the law when it stated that

> a cause effect relationship need not be established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound ... products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies on the chemical.

*Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1536–37 (D.C.Cir.1984). *See also Bloomquist v. Wapello County*, 500 N.W.2d 1, 5 (Iowa 1993) (Supreme Court of Iowa declined to apply a per se requirement of epidemiological evidence) ("In our view, while epidemiological evidence is helpful, it should not be held to be an absolute requirement in establishing causation.").

All of the cases in the preceding paragraph were decided before the Supreme

Court handed down its landmark decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[3] It is important to understand how *Daubert* shaped the landscape of this area of law, further discouraging mandates of epidemiological evidence. The *Daubert* Court held that Rule 702 of the Federal Rules of Evidence superceded the more "restrictive test" found in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The *Daubert* Court held that, for expert testimony to be admissible, the opinion need not have gained "general acceptance," as required under the *Frye* test. *Daubert*, 509 U.S. at 588, 113 S.Ct. 2786. In particular, the *Daubert* Court addressed whether the district court erred in excluding certain expert testimony because the experts did not offer epidemiological evidence to establish that the drug Bendectin caused birth defects. Finding that the District Court based its conclusion on the general acceptance standard, the *Daubert* Court vacated and remanded the case. The Court noted that "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory." *Id.* at 596–97, 113 S.Ct. 2786.

Since *Daubert*, courts have continued to reject a mandate for epidemiological evidence. "Epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound." *Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir.1995) (applying *Daubert*); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154 (3d Cir.1999) ("We do not believe that the [lower] court's reading of Rule 702–as requiring research studies supporting a finding of general causation-is correct.") Ultimately, no court has held that epidemiological evidence is necessary to establish general causation when other methods of proof are available.[4]

3. Some courts prior to *Daubert* did require that experts base their opinion on epidemiological evidence. However, these cases do not represent the current status of the law.

4. The cases Defendants cite are distinguishable: Although the Middle District of Louisiana touts the importance of epidemiological evidence in *Chambers v. Exxon Corp.*, 81 F.Supp.2d 661 (M.D.La.2000), there was no contention in that case, as there is here, that defendants had made admissions regarding general causation. Further, in *Sorensen v. Shaklee Corp.*, 31 F.3d 638 (8th Cir.1994) the circuit court merely affirms the lower court's decision to grant summary judgment given that plaintiffs experts were unreliable. "[T]he experts here reasoned from an end result in order to hypothesize what needed to be known but was not." *Id.* at 649. It is incidental to the opinion that one of the experts could not "identify any 'statistically significant epidemiological proof.'" *Id.* at 643 (quoting Dist Ct. Op. at 4).

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir.1995) ("*Daubert II*") is also distinguishable. In *Daubert II* the court held that, as an element of specific causation the plaintiffs "must prove that their injuries were the result of the accused cause and not some independent factor." *Id.* at 1320. The court continued: "In terms of statistical proof, this means that plaintiffs must establish that not just that their mothers' ingestion of Bendectin increased somewhat the likelihood of birth defects, but that it more than doubled it[.]" This doubling of the risk standard, however, does not apply in the matter *sub judice*. First, the doubling the risk standard does not apply to cases where there are mechanisms of proof other than epidemiological evidence. For example, one may prove specific causation through differential diagnosis—eliminating all other sources which could cause the injury in question. *See, e.g., Heller*, 167 F.3d at 154. Second, at the doubling of the risk standard does not apply to general causation. *See Hanford Nuclear Reservation Litig.*, 292 F.3d at 1137. ("The validity of a claim should not depend on whether plaintiff was exposed to a fraction of a rem lower than the 'doubling dose.' … The Manual [on Scientific Evidence] states that it limits its discussion [on doubling the risk] to the role of epidemiology in proving *individual causation*.") (emphasis added). The same applies to *In Re Breast Implant Litig.*, 11 F.Supp.2d 1217 (D.Colo.1998).

Defendants argue that Plaintiffs have failed to establish a genuine issue of material fact regarding causation because Plaintiffs have not offered any admissible expert testimony indicating that Meridia can cause compensable injury. To defendants, expert testimony is a prerequisite to get to a jury. They are correct, in part.

██ The Court of Appeals for the Third Circuit concluded that there is no federal rule requiring expert testimony in support of general causation in mass tort claims. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 750–52 (3d Cir.1994), *reh'g denied, cert. denied,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The court noted that such a rule would be, in part, (1) a rule regarding what types of evidence are admissible in mass tort cases, and (2) an aspect of a party's burden of proof. To the extent that such a rule affects a party's burden of proof, it is a substantive law under *Erie* analysis, and federal courts operating under diversity jurisdiction must apply state law on that issue. *Id.* Therefore, in cases originating from states that require expert testimony in mass tort cases,[5] Plaintiffs' claims would fail if the Plaintiffs did not offer admissible expert testimony tending to establish general causation. However, Plaintiffs who originally filed their cases in states that lack such a rule would not need expert testimony to get to a jury. Therefore, the Court need not dismiss their claims.

Rather than undertake an analysis of all fifty states' laws to determine which do and which do not require expert testimony on the issue of general causation, the Court assumes *arguendo* that no states' laws erect such a requirement. Regard-

less, the Court ends up in the same place: summary judgment for Defendants.

## B. Conclusions of Schwartz

Plaintiffs assert that they have created a material issue of fact with regard to causation based on the expert testimony of Dr. Schwartz. Schwartz works as a pharmacologist and holds his Ph.D. in pharmacy/pharmacology. Schwartz defines pharmacology as "the science of the mechanism of action of chemical entities called drugs on the human organism, and the action of the human organism on the drug." (Schwartz rep. at 3). Schwartz currently serves as a professor and director of the Institute of Molecular Pharmacology and Biophysics at the University of Cincinnati's College of Medicine. Schwartz also acts as the president and sole employee of CVR Inc., a company which conducts cardiovascular research. Finally, Schwartz serves as a consultant for the United States Air Force, Otsuka Pharmaceutical Company, and Tanabe Pharmaceutical Company. In this capacity, Schwartz has drafted package inserts and answered questions concerning drug doses and side effects.

In his preliminary report, Schwartz concludes that the risks associated with Meridia do not outweigh the benefits. Schwartz opines that Meridia results in only "very modest decrease in weight" but causes "very serious side effects and contraindications." (Schwartz Rep. at 6). Schwartz states that Meridia causes an increase in blood pressure and heart rate which "could lead to a fatal heart attack." *Id.* Specifically, Schwartz opines that Meridia causes adverse cardiovascular effects in patients because the drug increases lev-

---

5. New York is one such state. *See Meiselman v. Crown Heights Hosp.*, 285 N.Y. 389, 396, 34 N.E.2d 367, 370 (1941). Ohio is another. *See Ramage v. Central Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 592 N.E.2d 828 ("Un-

less a matter is within the comprehension of a layperson, expert testimony is necessary. Experts have the knowledge, training and experience to enlighten the jury concerning the facts and their opinion regarding the facts.").

els of norepinephrine throughout the body. (*Id.* at 4,6; Schwartz Dep. at 214–223).

Schwartz's conclusions revolve around his assumption that Meridia increases levels of norepinephrine throughout the body. Schwartz explains that Meridia operates as a blocker or inhibitor which inhibits "reuptake" (the body's dissipation) of norepinephrine as well as serotonin (a brain chemical associated with satiety). As a result of this, the norepinephrine or serotonin in the synaptic cleft of the brain increases considerably. (Schwartz rep. at 4). Using his knowledge base about how the body metabolizes drugs, Schwartz gives the hypothesis that norepinephrine crosses the blood brain barrier.[6] "[Meridia is] metabolized into M1 and M2, the drug, and M1 and M2 is distributed all over the body, including the brain. That's been shown." (Schwartz dep. at 216).

Defendants assert that any increases in NE would *not* cross the blood brain barrier in any significant manner. In a study conducted with rats, there were concentrations of the drug twice as high in the brain as in the plasma. Meanwhile, Defendants point out that the exact amount of the drug distributed in the human body is unknown. Moreover, to refute Schwartz' hypothesis, Defendants point to a study which found that individuals on Meridia had lower levels of norepinephrine in their blood than subjects on a placebo. Nevertheless, Defendants' rebuttals-while they may be persuasive to a jury-do not establish that Schwartz' testimony should be excluded.

At issue here is whether Schwartz has sufficient expertise and basis for his opinion so that he may survive the test for expert witnesses promulgated in *Daubert.* *Daubert* stands for the proposition that, pursuant to Rule 702 of the Federal Rules of Evidence, courts serve as "gatekeepers" to ensure that "any scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786.[7] This gatekeeping function "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).[8]

█ To be admissible, proffered expert testimony must be based "on a reliable and scientifically valid methodology that fits with the facts of a case." *Heller v. Shaw Industries,* 167 F.3d 146, 152 (3d Cir.1999). *Daubert* set forth guideposts for trial courts in assessing the reliability of scientific expert testimony. Among the factors

6. Pharmacologists and others distinguish between the brain or central nervous system on one hand, and the remainder of the body or the "periphery" on the other hand. A drug that affects both the central nervous system in the brain and other major organs of the body is said to cross the blood brain barrier.

7. Rule 702, amended in 2000 to incorporate the *Daubert* opinion, reads:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the principle has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702.

8. There is no requirement of a formal hearing to comply with *Daubert.* *See Greenwell v. Boatwright,* 184 F.3d 492, 498 (6th Cir.1999) ("Although the trial court is not required to hold an actual hearing to comply with *Daubert,* the court is required to make an initial assessment of the relevance and reliability of the expert testimony.").

the court may consider are (1) whether the theory or technique has been tested—that is, whether the expert's theory can be challenged in some objective sense; (2) whether the technique or theory has been subjected to prior review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the theory has gained general acceptance within the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.[9] This list is non-exclusive and district courts applying *Daubert* have broad discretion to consider a variety of other factors. *See Kumho Tire*, 526 U.S. at 145, 119 S.Ct. 1167.

The advisory committee notes to Rule 702 of the Federal Rule of Evidence explain other factors which a court may consider. Some of those factors include:

(1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995)

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See General Elect. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered.")

(3) Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir.1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition). *Compare Ambrosini v. Labarraque*, 101 F.3d 129 (D.C.Cir.1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert.)

Advisory Committee Note to FED. R. EVID. 702.

■ The court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. However, the court does not have the "discretion to abandon the gatekeeping function." *Id.* at 159, 119 S.Ct. 1167 (Scalia, J., concurring). Ultimately, as the proponents, Plaintiffs bear the burden of showing that Schwartz is qualified to render an expert opinion, that his opinion is reliable, and that it would assist the trier of fact in resolving a disputed issue of material fact, i.e. causation. *See Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); FED. R. EVID. 104(a).

In applying the *Daubert* standard to the testimony of Schwartz, the Court is concerned regarding both the scope and content of Schwartz's conclusions. As to the scope of Schwartz' testimony, "a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render testimony unreliable under Rule 702." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir.2001); *see also Marquardt v. Joseph*, No. 98–5163, 1999 WL 196569, 1999 U.S.App. LEXIS 5984, at *4

---

9. The *Daubert* factors are not exclusive and may not be pertinent in any given case. *See Kumho Tire*, 526 U.S. at 148, 119 S.Ct. 1167. *See also Tyus v. Urban Search Mgmt.*, 102 F.3d 256 (7th Cir.1996)(noting that the factors mentioned by the Court in *Daubert* do not neatly apply to expert testimony from a sociologist).

(6th Cir. Mar. 30, 1999) ("We have said that if a trial court allows an expert to testify beyond her expertise it failed to perform its gatekeeping function under the *Daubert* case."). Under *Daubert*, "the inquiry as to the appropriateness of a given expert's testimony is fact specific." *Laski v. Bellwood*, No. 99–1063, 2000 U.S.App. LEXIS 12068, 2000 WL 712502 (6th Cir. May 25, 2000).

■ Here, Schwartz does not hold himself out as a cardiologist. Plaintiffs make no showing that Schwartz's expertise in pharmacology provides him with the qualifications to comment on adverse cardiovascular events. At most, Schwartz is knowledgeable about cardiovascular pharmacology. Schwartz has performed research in cardiovascular pharmacology and served as the research director of the Cardiovascular Research Center at Baylor College of Medicine. Schwartz is a fellow for the American College of Cardiology, American Heart Association, and International Heart Failure Society. This background, while impressive, does not qualify Schwartz to give expert testimony best suited for a cardiologist. Therefore, while Schwartz is qualified to testify regarding how Meridia acts on the body and its systems (including the cardiac system), he cannot testify regarding whether a particular level of injury will result from a certain level of blood pressure increase, or whether a certain likelihood of death will attend certain increases in heart rate.

■ Schwartz also is not qualified to testify as an obesity expert. Schwartz' involvement with obesity is fairly limited; he has attended symposia on weight loss and lectured regarding obesity. As part of his work for the United States Air Force, Schwartz worked with a team that made decisions concerning whether to prescribe weight loss medication and which medication to prescribe. Nevertheless, Plaintiffs make no showing that Schwartz is specially qualified to testify regarding the effects of certain levels of weight loss on one's health. Thus, the Court does not allow Schwartz to testify regarding whether any "benefits" from a certain level of weight loss outweigh "risks" accompanying the use of a weight loss medication.[10]

■ In regard to the substance of Schwartz' testimony, Schwartz does not give foundation as to how he reaches his conclusions with regard to causation. As described above, Schwartz opines that norepinephrine crosses the blood brain barrier and causes increased blood pressure and heart rate. When attempting to explain his conclusion, Schwartz often resorted to circular logic: "I think it's generally agreed that when blood pressure and heart rate are increased by reuptake inhibitors, of norepinephrine now, neorepinephrine, it occurs all over the body." (Schwartz dep. at 221). Thus, Schwartz first starts with the conclusion that Meridia causes high blood pressure then hypothesizes about the mechanisms of how the drug caused that result. Such analysis cannot be used as evidence of causation. Further, Schwartz himself acknowledges that he is unsure about the exact amount of Meridia

**10.** Within these confines, as a pharmacologist with ample experience in the approval and packaging of drugs, Schwartz could provide expert testimony regarding the appropriateness of the development and marketing of Meridia. Schwartz has assisted pharmaceutical companies in drafting package inserts and has helped develop marketing and educational materials. Additionally, Schwartz has designed and prepared regulatory submissions and taught courses on proper sales methodology to medical sales representatives. Given this background, Schwartz is qualified to give his expert opinion on these matters. Nevertheless, as described in Section VII, *infra*, these state consumer protection claims do not survive the summary judgment stage.

which is distributed throughout the human body: "The drug is in fact distributed all over the body ... but how much in the human is not known." (Schwartz rep. at 6). Instead, Schwartz expresses concern "with any drug, but specifically Meridia, that effects norepinephrine." (Pl. opposition at 34). Such vague assertions, without sufficient explanation as to how Meridia causes increased blood pressure and heart rate, render Schwartz' testimony on this point unreliable. *See Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1207–08 (10th Cir.2002) (holding that the district court did not abuse its discretion in excluding experts' theory of causation based on the pharmacological properties a drug, without ample explanation as to how that drug caused negative health effects).

As described, Schwartz posits that Meridia raises blood pressure. However, the scientific community has yet to reach a consensus on this issue. In a systematic review of clinical trials published on this issue, the authors found that not enough strong data exists to draw any strong conclusions regarding Meridia's effect on blood pressure. David E. Arterburn, Paul K. Crane, & David Veenstra, *The Efficacy and Safety of Sibutramine for Weight Loss: A Systematic Review*, 164 Arch. Intern. Med. 994, 1000 (2004) [hereinafter, Arterburn, et al., *The Efficacy and Safety of Sibutramine* ]. One study found that users of Meridia showed a mean systolic increase in blood pressure of 4.4 mm Hg and a diastolic increase of 3.3 mm Hg. But does this minimal increase result in health consequences? Schwartz shows no training or experience allowing him to answer this question. Restating, Schwartz is qualified to render opinion on certain pharmacological effects of Meridia, but he is not qualified to testify regarding whether

these effects are capable of causing compensable injury. Thus, Schwartz' testimony is not competent for purposes of general causation.

Plaintiffs attempt to defend Schwartz' vague assertions by pointing out that Schwartz bases his opinion on "his education, training, and experience." (Pl. opposition to Def. motion to exclude pl. expert witness testimony at 33). However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the fact." Advisory Committee Note to FED. R. EVID. 702. In the matter *sub judice*, Schwartz does not provide this Court with more than conclusory statements regarding his opinions.

Schwartz's testimony calls upon this Court to rely solely on his subjective judgments. However, the more subjective an expert's inquiry, the more likely the testimony should be excluded as unreliable. *See, e.g., O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.1994). "We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir.1995). *See also Samarah v. Danek Med., Inc.*, 70 F.Supp.2d 1196, 1206 (D.Kan.1999) ("Indeed, there is nothing in Dr. Armani's notes to indicate ... how he arrived at the conclusion that defendants' bone screws caused the injuries for which plaintiff presently seeks damages.").

For the aforementioned reasons, the Court grants-in part-Defendants' motion to exclude the expert testimony of Schwartz.[11] As a result, Schwartz does

---

11. Schwartz would be permitted to testify as an expert only with regard to the marketing and packaging of Meridia.

not assist the Meridia Plaintiffs in creating a material dispute of fact with regard to causation.[12]

### C. Proportional Reporting Rate Analysis

Plaintiffs next attempt to create an issue of material fact based on a "proportional reporting rate analysis" performed by Keith Altman. Altman collects and analyzes adverse event data on file with pharmaceutical companies and the Food and Drug Administration ("FDA"). The adverse event drug experience reports, which form the basis of Altman's data, were prepared by consumers, physicians, or nurses and sent to the pharmaceutical companies, who then forwarded them to the FDA. Federal regulations require that all domestic adverse experiences with a marketed drug be reported to the manufacturer who, in turn, must report the adverse events to the FDA. Additionally, consumers may directly inform the FDA of alleged adverse reactions and experiences.[13] FDA regulations call for reports of adverse events following usage of drugs whether or not there is any belief of a causal relationship. *See* 21 C.F.R. § 314.80(c).

In the matter *sub judice*, Altman compiled statistics regarding adverse events for Meridia and juxtaposed the results with the results of other drugs—Xenical (Orlistat), Effexor, and Ultran. Altman's charts and graphs, contained in Exhibits C and D, represent the percentages of differ-ent types of adverse events associated with Meridia and Xenical, one of Meridia's competitors. It is notable that the charts *do not* depict raw numbers.

Of particular importance, Altman examines the total number of reports of adverse cardiovascular events for both Meridia and Xenical. He then compares the percentages of reports from cardiovascular events for each drug. From these calculations, Plaintiffs conclude that "incidences of [various] cardiovascular injuries dramatically exceed and are more than twice as likely to [be] reported in connection with Meridia usage than in connection with Xenical usage[.]" (Pl. br. at 35). Plaintiffs attempt to offer Altman's data as evidence of general causation.

Even readers with only a casual understanding of statistics can recognize that this evidence does not speak to the issue of causation, and therefore cannot create a genuine issue of material fact. Indeed, proportional reporting rate analyses are incomplete and often misleading because they do not show the total distribution of reports. The following example illustrates this flaw: Suppose that 10,000 people received Meridia and an additional 10,000 received Xenical. Suppose further that 100 people from each group developed hypertension and that an additional 100 from the Xenical group experienced severe stomach pains. Under a proportional reporting rate analysis, Meridia would have

12. Defendants also argue that all of Plaintiffs' experts are not relevant because they do not rely upon epidemiological data in formulating their opinions. "However, we do not read *Daubert* as restricting expert testimony to opinions that are based solely upon epidemiological data .... Under the *Daubert* standard, epidemiological students are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound." *Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1384 (4th Cir.1995). *See also Turner v. Iowa*

*Fire Equip.,* 229 F.3d 1202, 1209 (8th Cir. 2000) ("We do not believe that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.").

13. Mr. Altman creates his tables and charts based on reports sent to the FDA from the manufacturer, reasoning that this eliminates the duplicity of reports which are sent both to the FDA and to the manufacturer.

a hypertension rate of 100%, whereas Xenical's hypertension rate would be only 50%. This analysis conveys the impression that people taking Meridia are twice as likely to develop hypertension than are people taking Xenical, even though the condition occurred with the same frequency in both groups in the above hypothetical. Clearly, such evidence conceals too much to speak directly to the issue of causation. For this reason, the Court rejects Plaintiffs' proportional reporting rate analysis and holds that such evidence is insufficient to create a genuine issue of material fact regarding general causation.

The Court further notes that this determination is consistent with other courts' conclusions regarding proportional reporting rate analyses. *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1199 (11th Cir.2002) (noting that "case reports alone cannot prove causation"); *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989–90 (8th Cir.2001) (noting that case reports do not screen out alternative causes for the adverse event and often lack analysis; concluding that the temporal correlation upon which they are based is not scientifically valid proof of causation); *Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672 (M.D.N.C. 2003) (noting that one of the plaintiff's own witnesses "acknowledge[d] that adverse drug reaction case reports are of limited value in determining causation").

Given that Altman's data is irrelevant to establish a material issue of fact at the summary judgment stage, the Court denies as moot Defendant's motion to strike Altman's affidavit.[14]

## D. Defendants' Alleged Admissions

Ultimately, Plaintiffs' primary argument in support of summary judgment is that the Meridia label and internal company documents reveal Defendants' recognition that Meridia has the capacity to cause injury. This is a novel argument, and it creates an issue of first impression for this Court.

Plaintiffs argue that Abbott's own records constitute an admission that Meridia

---

**14.** It is notable that the Altman affidavit is not procedurally deficient. Defendants are correct that this Court should strike Mr. Altman's affidavit if Plaintiffs are offering Mr. Altman as an expert witness. This Court ordered that Plaintiffs disclose their expert witnesses by June 30, 2003 and submit preliminary reports from their experts by August 15, 2003. Plaintiffs did not disclose Mr. Altman as an expert witness nor did they submit a preliminary report from him. *See Vance v. United States*, No. 98–5488, 1999 WL 455435, 1999 U.S.App.LEXIS 14943, (6th Cir. June 25, 1999) (holding that Rule 37(c)(1) requires the exclusion of expert testimony first disclosed after deadline imposed in scheduling order and supplemented in response to motion for summary judgment); *Pavicic v. Quaker Oats Co.*, No. 96–74578, 1997 U.S. Dist. LEXIS 21388, at *14 (E.D.Mich. Dec. 15, 1997) (excluding expert testimony where the parties submitted the expert report one month late).

Nevertheless, Plaintiffs concede that Mr. Altman is not an expert. Further, Mr. Altman does not present statistical evidence which requires an expert. Within the Sixth Circuit, "there is no requirement that statistical evidence be supported by expert testimony." *McCabe v. Champion Intern. Corp.*, 916 F.2d 713 (6th Cir.1990)(citing *EEOC v. Pet, Inc.*, 543 F.Supp. 911, 914 (M.D.Ala.1982), *aff'd* 719 F.2d 383 (11th Cir.1983)). There is consensus among courts that "[p]arties should not be deprived of the opportunity to present the results of fairly simply statistical tests simply because they cannot obtain the services of a trained statistician." *Green v. Kinney Shoe Corp.*, 715 F.Supp. 1122, 1124 (D.D.C.1989). If a witness performs "simple arithmetic" and avoids analyzing the data, the witness does not need to qualify as an expert. *Stratton v. Dep't for the Aging*, 132 F.3d 869, 877 (2d Cir.1997). Here, the data at issue involves the mere compilation of numbers and does not involve analysis of the data. Thus, Plaintiffs have not missed the deadlines for expert witnesses.

is capable of causing injury. Plaintiffs' witness Altman compiled evidence obtained from electronic discovery, including data from an adverse events database that Abbott maintained. According to Altman, the database contained the company's determinations of whether "Meridia was causally related to" particular adverse events. (Altman Aff't ¶ 26). Exhibit F to Altman's affidavit charts all serious adverse event reports in which either the reporter (the patient or medical professional who filed the report) or Abbott allegedly concluded that there was a probable causal relationship between the drug and the adverse event. According to Altman's chart, Abbott found a "probable" relationship between Meridia and the following adverse events:

> unwanted pregnancy, blood pressure increase, psychotic disorder, non-accidental overdose, angina pectoris (two instances), hypertensive crisis, illusion, panic reaction, peripheral coldness, sweating increased, suicide attempt, tachycardia NOS (two instances), hypertension NOS (two instances), anaemia NOS, dyspnea NOS (two instances), hepatic disorder NOS, hypokalaemia, pyrexia, hepatomegaly, liver function tests NOS abnormal, and enteritis haemorrhagic (two instances).

Altman Aff't, Exh. F. Additionally, according to the chart, Abbott noted a "probable" causal relationship between Meridia and a longer list of adverse events, ranging from insomnia to dyspepsia to renal failure. *Id.*

 However, in deposition, Abbott's former director of post-marketing safety testified that the internal company documents do not reflect attempts to determine causation. Instead, members of the post-marketing safety team examine the adverse event reports "for a ... potential signal," meaning "a particular pattern of events that might have a specific characteristic signature or symptom complex, similar temporal relationship... [or] some biological plausibility for the event." (Carlson Dep. at 150). She further testified that the final reports to the regulatory agencies,[15] not the internal company documents, represent the company's *conclusions* regarding the adverse event reports. *Id.* at 153. Because the internal documents do not represent conclusions, Defendants say they cannot constitute admissions

Plaintiffs also argue that the fact sheets that Abbott provided as package inserts with Meridia constitute admissions of general causation. Abbott supplied fact sheets to both physicians and patients. These inserts contain detailed product information on Meridia. Both the physician sheet and the patient sheet are relevant to determining whether Abbott admitted that Meridia is capable of causing injury.

The product information provided to physicians is extensive. It describes the

---

15. Abbott also argues that the company's regulatory submissions are legally shielded from being construed as admissions. The Court rejects this argument. The regulation in question states, *

> A report or information submitted [to the United States Food & Drug Administration] by an applicant ... does not *necessarily* reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to the adverse effect. An applicant need not admit, and may deny, that the report or information submitted ... constitutes an admission that the drug caused or contributed to an adverse effect.

21 C.F.R. § 314.80(k) (emphasis added). The regulation's permissive language places the task of determining whether a particular statement is an admission with the courts. It would hardly make sense for a drug company to file a report stating, "Our drug caused patient X's death" with the FDA, yet later escape liability by denying that the report constitutes an admission.

chemical makeup of Meridia, its mode of operation, and the results of various studies. In its "Warnings" section, the fact sheet states in bold letters: "MERIDIA SUBSTANTIALLY INCREASES BLOOD PRESSURE IN SOME PATIENTS. REGULAR MONITORING OF BLOOD PRESSURE IS REQUIRED WHEN PRESCRIBING MERIDIA." The sheet also lists adverse reactions that patients taking Meridia experienced both in clinical trials and in post-marketing reports. These adverse events ranged from the mundane (e.g., increased salivation, yawning, and acne) to the severe (e.g., congestive heart failure, sudden unexplained death, and heart arrest).

The product insert provided to patients offers information in a Q & A format. It notes, "In studies the most common side effects were: dry mouth, constipation, loss of appetite, and insomnia (inability to fall asleep). Other side effects that may occur include: headache, increased sweating, an increase in blood pressure, and an increase in heart rate." Shortly thereafter, the insert states in bold letters: "MERIDIA SUBSTANTIALLY INCREASES BLOOD PRESSURE IN SOME PATIENTS. REGULAR MONITORING OF BLOOD PRESSURE IS REQUIRED WHEN TAKING MERIDIA." Finally, the insert notes that certain diet drugs have been associated with pulmonary hypertension (PPH), which it describes as "a rare but sometimes fatal disease" and cardiac valve dysfunction. However, the insert states that it is unknown whether Meridia may cause either condition.

█ Reading the product inserts to both physicians and patients in the light most favorable to the Plaintiffs, as the Court must at this stage, the Court concludes that the inserts constitute admissions of Meridia's potential to cause sub-

stantial increases in blood pressure *in some patients*. The insert lists the other conditions as being "associated" with Meridia. Such admissions of temporal associations (or reports of temporal associations) are insufficient to create admissions of causation. Therefore, Plaintiffs have met their burden of showing a genuine issue of material fact only with respect to Meridia's capacity to cause substantial increases in blood pressure. For all other conditions, Plaintiffs have not met their burden. The Court therefore **GRANTS** Defendants' motion for summary judgment with regard to all tort claims involving harms not related to increased blood pressure. Nevertheless, the remaining product liability claims will prove insufficient for plaintiffs to recover.

## II. Strict Product Liability

Section 402A of the *Restatement (Second) of Torts* provides for strict product liability in tort for sellers of "any product in a defective condition unreasonably dangerous to the user or consumer." Plaintiffs allege product liability claims under three separate theories—inadequate warning, defective design, and manufacturing defect.[16] The Court addresses these claims in turn.

### A. Failure to Instruct and Warn

█ First, Plaintiffs allege claims based on the inadequate warning theory. Under this theory, a product is "in a defective condition unreasonably dangerous" when it is not accompanied by warnings sufficient to allow users to avoid risks inherent in the product. According to Plaintiffs, Defendants have a duty to both warn and to instruct consumers. In support of this argument, Plaintiffs focus on the conjunctive language of statutes and case law.

---

**16.** The *Restatement (Third) of Torts* explicitly recognizes these three separate theories. Re-

statement (Third) of Torts: Product Liability § 2 (1998).

For instance, they note that under Ohio's products liability statute, a prescription drug is not defective "if the manufacturer ... provides adequate warning *and* instruction ...." Ohio Rev.Code § 2307.75(D) (emphasis added). Additionally, they cite *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254 (5th Cir. 2002), for the proposition that Louisiana's products liability statute contains a definition of "adequate warning" that encompasses instructions as well as warnings. *Id.* at 269–70. The Court notes that a textual reading of the *Restatement (Third) of Torts* supports this conclusion. Subsection 2(c) of the *Restatement* states that a product may be "defective because of inadequate instructions *or* warnings." RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 2(c) (1998) (emphasis added). Therefore, the Court must examine both defendants' warnings and their instructions and assess the adequacy of each.

■ Defendants argue that Plaintiffs have failed to set forth a genuine issue of material fact with regard to their failure to instruct and warn claims. According to Defendants, the learned intermediary doctrine shields them from liability. Under the learned intermediary doctrine, manufacturers of prescription drugs escape liability for failure to instruct and warn consumers so long as they adequately instruct and warn physicians responsible for prescribing the medication. *See Pittman v.* *Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn. 1994). The underlying premise of this doctrine is that patients rely on their doctors' expert judgment-not any materials included on the label or in the drug packaging-when deciding which drugs to use and how to use them. *See, e.g., Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 202–03, 423 N.E.2d 831 (1981) (stating that under the learned intermediary doctrine, "[t]he patient is expected to place primary reliance upon the physician's judgment, and to follow his advice and instructions as to use of the drug.").[17] Drug manufacturers may reasonably rely on physicians to transmit their warnings to the end-users—patients.

■ The overwhelming majority of states have adopted the learned intermediary doctrine.[18] Therefore, this Court properly undertakes this analysis and applies the learned intermediary doctrine to Plaintiffs' claims. The learned intermediary doctrine does not necessarily bar all failure to warn claims against drug manufacturers. For instance, it does not shield drug manufacturers from liability if the warnings they provided to *physicians* would not permit the physicians to adequately advise their patients. *See Amore v. G.D. Searle & Co.*, 748 F.Supp. 845, 850 (S.D.Fla.1990). Therefore, the threshold issue for the Court is whether the warnings Defendants provided to physicians were adequate to permit the physicians to prop-

---

**17.** As the Illinois Supreme Court explained,
 Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one.
 *Martin v. Ortho Pharm. Corp.*, 169 Ill.2d 234, 238, 214 Ill.Dec. 498, 661 N.E.2d 352 (1996) (citation omitted).

**18.** The Tenth Circuit recently found that 44 states, plus Wyoming, had adopted the learned intermediary doctrine in prescription drug cases. *Thom v. Bristol Myers Squibb Co.,* 353 F.3d 848, 852 (10th Cir.2003). Plaintiffs also note that Vermont has not recognized the learned intermediary doctrine in failure to warn cases; however, their failure to provide a complete citation for this point of law prevents the Court from being able to evaluate their claim.

erly prescribe Meridia and to properly instruct patients how to use it.[19]

Generally, whether a particular warning is "adequate" is a question of fact to be resolved by a jury. However, "where the warning is accurate, clear, and unambiguous," it is a question of law. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 853 (10th Cir.2003) (citing *Felix v. Hoffmann–LaRoche, Inc.*, 540 So.2d 102, 105 (Fla.1989)). To be considered adequate, a warning concerning a prescription drug generally must "contain a full and complete disclosure of the potential adverse reactions to the drug." *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn.1994). Put differently, "a warning is 'adequate' ... where, under all the circumstances, it reasonably discloses to the medical profession all risks inherent in the use of the drug which the manufacturer knew or should have known to exist." *Seley*, 67 Ohio St.2d at 198, 423 N.E.2d 831.[20] Merely mentioning a possible injury or adverse effect is not necessarily adequate. *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267 (5th Cir.2002). Instead, at least five factors are relevant in determining whether a warning is adequate as a matter of law:

1. The warning must adequately indicate the scope of the danger

2. The warning must reasonably communicate the extent or seriousness of the harm that could result from misuse of the drug;

3. The physical aspects of the warning must be adequate to alert a reasonably prudent person to the danger;

4. A simple directive warning may be inadequate when it fails to indicate the consequences that might result from the failure to follow it; and

5. The means to convey the warning must be adequate.

*Thom*, 353 F.3d at 853 (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn. 1994)).

Defendants included the following warning on product inserts available to physicians: "MERIDIA SUBSTANTIALLY INCREASES BLOOD PRESSURE IN

---

**19.** Plaintiffs argue that the Court should not apply the learned intermediary doctrine, citing the New Jersey Supreme Court's conclusion that "[c]onsumer-directed advertising of pharmaceuticals ... belies each of the premises on which the learned intermediary doctrine rests." *Perez v. Wyeth Labs., Inc.*, 161 N.J. 1, 19, 734 A.2d 1245 (1999). Plaintiffs encourage this Court to apply the *Perez* court's reasoning to all plaintiffs' claims. Although the *Perez* opinion is certainly well-reasoned, plaintiffs' argument poses a major federalism problem. This Court is a federal court with jurisdiction over plaintiffs' claims based on diversity of citizenship. As such, it must apply the law of each state, or where a state's law is silent on a particular issue, its prediction of what that state's supreme court would hold. Five years have passed since the New Jersey Supreme Court decided *Perez*. In the intervening period, no other state has followed New Jersey's lead. The Court thus could not apply *Perez*'s logic even if it desired to do so.

Plaintiffs further argue, that at a minimum, the New Jersey cases should survive summary judgment based on *Perez*. This argument sounds persuasive until one finishes reading *Perez*. The Supreme Court of New Jersey held that compliance with FDA rules and regulations creates a rebuttable presumption that the manufacturer fulfilled its duty to adequately warn consumers (not physicians, because the learned intermediary doctrine does not apply in New Jersey when the manufacturer advertises directly to consumers). *Id.* at 24–25, 734 A.2d 1245. Plaintiffs have provided no reason to believe that defendants violated the FDA's rules and regulations. Therefore, even applying *Perez* gets the Plaintiffs nowhere.

**20.** The *Seley* court noted that by focusing on reasonableness, the "adequacy" inquiry incorporates negligence concepts into this strict liability approach. 67 Ohio St.2d at 199, 423 N.E.2d 831.

SOME PATIENTS. REGULAR MONITORING OF BLOOD PRESSURE IS REQUIRED WHEN PRESCRIBING MERIDIA." In assessing the adequacy of the warning, the Court must bear in mind the intended audience-physicians. Because physicians are highly trained and able to make much better medical judgments than the consumer, warnings that might not be adequate to average consumers may very well be adequate to physicians.

■■■ Regarding the first factor, the proffered warning does not detail the scope of the danger. However, because it is directed at physicians, it need not. Physicians are well aware of the scope of the risks associated with increased blood pressure and do not need specifics regarding the possible consequences of blood pressure increases. The same analysis applies to the second and fourth factors. Physicians understand the effects of high blood pressure and the seriousness of the harm that can result from continuing Meridia treatment with patients who have already experienced elevations in blood pressure. The third factor also indicates that the warning is adequate. The warning is printed in bold capital letters just under the heading, "Warnings." The physical aspects of the warning are therefore sufficient. Finally, considering the fifth factor indicates that the warning is adequate. Defendants conveyed the warning on a product insert-something that one may reasonably assume that physicians will read. *See, e.g.,* RESTATEMENT (SECOND) OF TORTS, § 402A cmt. j ("Where a warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.").[21] After all, if physicians fail to read the insert, they may well fall below their duty of care to patients.

Plaintiffs attempt to salvage their failure to warn claims with testimony from their experts, but to no avail. Dr. Schwartz, for instance, says that if doctors gave Meridia to patients with high blood pressure or to patients who do not respond within four weeks, they did so because they were not properly educated. (Schwartz Dep. at 283). Yet, Dr. Schwartz says nothing to support this conclusory statement. He provides no reasons why their doing so could be due to negligence or a failure to read the warnings that Defendants provided. Similarly, Schwartz implies that the label's insistence on "adjust[ing] the dose" is not adequate because it should say "discontinue the drug." (Schwartz Dep. at 279). Again, Schwartz does not explain the foundation for his opinion that doctors should discontinue Meridia treatment, rather than lessen the dose, once patients fail to respond in four weeks.

Plaintiffs, however, assert that even if the warnings were adequate, Defendants are still liable for failing to provide adequate *instructions* to physicians. Plaintiffs support this argument with the deposition testimony of Dr. Samuels, who states that the label does not give enough guidance to doctors regarding at what point they should discontinue the drug or how frequently they must monitor patients' blood pressure. (Samuels Dep. at 190). Dr. Samuels' point is well-taken, but it overlooks the fact that such judgments are often better left to the doctors' discretion. Doctors are in a unique position to determine how best to treat their patients-a much better position than that of a faraway official in a pharmaceutical company,

---

21. Comment *j* applies to warnings directed at ordinary consumers. Because of doctors' heightened duty of care, it applies *a fortiori* to the case of prescription drug warnings directed to physicians.

whose job is merely to write warnings. The law does not mandate that pharmaceutical manufacturers and marketers provide such specific instructions that they leave little room for doctors' reasonable medical judgment.

Plaintiffs include a hodgepodge of other arguments allegedly in support of their failure to instruct and warn claims. For instance, Plaintiffs argue that Defendants over-promoted Meridia, and thereby nullified the effect of any warnings they may have provided. In support of this argument, Plaintiffs cite to two cases, both at least thirty years old and only sparsely cited since they were decided. The cases are *Whitley v. Cubberly*, 24 N.C.App. 204, 210 S.E.2d 289 (1974), and *Stevens v. Parke, Davis & Co.*, 9 Cal.3d 51, 107 Cal. Rptr. 45, 507 P.2d 653, 661 (1973). Aside from being so stale that their legitimacy as legal authority is questionable, these cases are doctrinally distinguishable. Both *Whitley* and *Stevens* involved claims of *negligence* based upon defendants' over promotion of drugs; neither involved the strict liability theory for which they are presently offered. More importantly, however, the cases are factually distinguishable. The pharmaceutical company in both cases knew that the relevant drug (Chloromycetin) was very risky. Contrariwise, Plaintiffs here have produced a mere scintilla of evidence that Meridia is harmful. Had they come forth with evidence that using Meridia poses substantial risks of harm, then their claims that overpromotion nullified the defendants' warnings might have been sufficient. Given the paucity of evidence that Meridia is harmful, however, the Court must reject this claim.

Additionally, Plaintiffs argue that Defendants failed to timely submit adverse event reports to the FDA and mischaracterized some of the events contained in the reports. Try as it might, the Court cannot figure out what this argument has to do with Plaintiffs' failure to instruct and warn claim. Perhaps the Plaintiffs believe that had the Defendants submitted the information on time and accurately, then the FDA would have required that Defendants place this information on the labels, and no one would have had those adverse effects in the future. This logic is far-fetched. The main problem here is materiality-a missed deadline doth not a failure to warn make without some evidence that the missed deadline caused a failure to warn and a consequent harm. Plaintiffs have failed to generate any such evidence, so the Court rejects this argument as well.

For the foregoing reasons, the Court concludes that the warnings that defendants provided to physicians were adequate. Therefore, the learned intermediary doctrine shields defendants from liability for plaintiffs' claims for failure to instruct and warn.

■ For those states that have not adopted the learned intermediary doctrine, the Court concludes that Defendants' warnings to consumers are adequate. The Meridia product insert aimed at consumers includes the same warning, in the same capital boldface type, as the physicians' insert. This warning adequately indicates the scope of the danger, and its physical aspects and placement are adequate to sufficiently warn consumers. Although the warning does not detail the potential consequences of increased blood pressure, it need not, for common knowledge dictates that high blood pressure is detrimental to health. While individual consumers may not be able to recite the litany of adverse consequences produced by high blood pressure, they certainly know that increases are a cause for concern. Further, the warning alerts consumers of the need for increased vigilance regarding their blood pressure, which will enable them to

ward off the potential adverse consequences before they materialize.

For the reasons explained above, the Court **GRANTS** defendants' motion for summary judgment on Plaintiffs' failure to warn claims.

## B. Design Defect

Plaintiffs also argue that Meridia is defective by design and that they are entitled to recover on this basis. In response, Defendants offer testimony from their experts that amalgamating the results of all published studies on Meridia demonstrates that the drug is safe and effective.

▮▮▮ Generally, to recover under a design defect theory, plaintiffs must show that the challenged product fails either the risk/utility test or the consumer expectations test. Under the risk/utility test, courts examine whether *on average* the risks of the particular product outweigh its benefits. *See, e.g.,* Ohio Rev.Code § 2307.75(A)(1) (product is defective if "[w]hen it left the control of its manufacturer, the foreseeable risks associate with its design or formulation ... exceeded the benefits associated with that design or formulation ..."). Under the consumer expectations test, a product is defective if it is more dangerous than an ordinary consumer would expect when the product is used in a reasonably foreseeable manner. *See, e.g.,* Ohio Rev.Code § 2307.75(A)(2). Generally, an adequate warning is a defense to design defect claims levied against prescription drugs. *See, e.g.,* Ohio Rev. Code § 2307.75(D) ("An ethical drug ... is not defective in design or formulation because some aspect of it is unavoidably unsafe, if the manufacturer of the ethical drug ... provides an adequate warning and instruction ... concerning that unavoidably unsafe aspect."); RESTATEMENT (SECOND) OF TORTS § 402A cmt. k ("There are some products which, in the present state of human knowledge, are quite incap-

able of being made safe for their intended and ordinary use. These are especially common in the field of drugs.... Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous.").

Here, Defendants argue that Plaintiffs' design defect claims must fail for several reasons. First, they argue that the expert testimony demonstrates that Meridia's benefits outweigh its risks. According to Defendants, the expert testimony establishes that Meridia causes significant reductions in weight, which in turn reduces various cardiovascular risk factors. In other words, the beneficial effects of Meridia-induced weight loss outweigh any increase in blood pressure that Meridia may cause. In support of this argument, Defendants note that most patients actually experienced a *decrease* in blood pressure, as the drop in blood pressure resulting from the weight loss exceeded any increase associated with taking Meridia. Second, Defendants argue that the consumer expectation test is inapplicable in this case because Meridia is a drug. Finally, Defendants argue that Plaintiffs failed to offer evidence of a feasible alternative design and, therefore, cannot show that the design of Meridia is defective.

Plaintiffs respond by arguing that the risks of Meridia outweigh its benefits. They base their arguments on three sources of information. First, they rely on analysis of the adverse event reports databases. Next, they rely on testimony from Dr. Schwartz. But Dr. Schwartz' testimony is inadmissible, for reasons explained above. Further, as explained above, adverse event data is irrelevant to the issue of whether Meridia causes any particular malady.

Plaintiffs' third source of evidence is a recently published article from the *Ar-*

*chives of Internal Medicine.* The article, entitled "The Efficacy and Safety of Sibutramine for Weight Loss," undertakes a systematic review of published and unpublished randomized controlled trials of Meridia. More specifically, the authors reviewed the results of studies that met the following seven criteria:

(1) randomized controlled trial;
(2) sibutramine [Meridia], 10 to 20 mg/d, was administered;
(3) placebo-controlled trial;
(4) overweight or obese subjects (body mass index $\geq$ 25);
(5) subjects were aged 18 years or older;
(6) weight loss was assessed; and
(7) 8–week duration or longer.

Arterburn, et al., *The Efficacy and Safety of Sibutramine, supra,* at 995.

The results of this analysis cast some doubt on the Defendants claims that Meridia is safe and effective. With regard to effectiveness, the results indicate that Meridia does lead to moderate weight loss. Participants in 8– to 12–week studies lost an average of 2.78 kg (about 6.1 pounds). *Id.* at 996. Participants in 44– to 54–week trials lost an average of 4.45 kg (about 9.8 pounds). *Id.* at 999.[22] After about a year of use, Meridia users are between 19% and 34% more likely than those taking a placebo to achieve weight loss exceeding 5% of body weight, and about 12% to 31% more likely to lose 10% of body weight. *Id.* However, studies tracking weight regain following cessation of Meridia treatment found that Meridia patients tend to regain about half of the weight lost while on Meridia. *Id.* at 1000. The article concludes that taking Meridia in addition to

implementing healthy lifestyle changes is more effective at producing weight loss than is taking a placebo and implementing the same lifestyle changes. *Id.* at 1001.

In sum, the article supports the Defendants' contention that Meridia is effective, although it also indicates that Meridia is not as effective as Defendants claim.

With regard to Meridia's safety, the article suggests that it is not yet clear how safe Meridia is. At least one study revealed an increase in Meridia patients' blood pressure after taking the drug for one year. In that study, the Meridia patients blood pressure rose by 4.4 mm Hg systolic over 3.3 mm Hg diastolic; placebo patients experienced an average increase of 0.2 mm Hg over 0.5 mm Hg. *Id.* at 1000. Further, "[t]he effects of sibutramine on systolic and diastolic blood pressure in the high-quality 3– and 6–month trials were highly varied, and ranged from net reductions to net increases." *Id.*

While the article's findings detract from the validity of Defendants' sounds-like-advertising assertions that "Meridia is safe and effective," they do not entitle Plaintiffs to get to a jury. The article authors "conclude that there is insufficient evidence to accurately determine the risk-benefit profile for sibutramine." *Id.* at 1002. In this case, Plaintiffs bear the burden of proving that Meridia's risk-benefit profile is negative. To survive summary judgment, they must produce evidence from which a reasonable jury could conclude that Meridia's risk-benefit profile is negative. They have failed to do so. A study concluding that Meridia's risk-benefit profile is unclear is insufficient, by itself, to permit a reasonable jury to con-

---

22. The article found that results from the 16– to 24–week trials were too heterogeneous to interpret in a meaningful way. It is notable, however, that among studies of that range of duration, the studies with higher follow-up

percentages (more participants finishing the study) featured a significantly lower mean weight loss (3.43 kg) than studies with follow-up rates below 70% (about 6 kg).

clude that Meridia's risk-benefit profile is negative. Therefore, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' design defect claims.

## C. Manufacturing Defect

Plaintiffs have abandoned their manufacturing defect claims. Because they have offered no evidence in support of these claims, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' manufacturing defect claims.

## III. Negligence Per Se

Plaintiffs also argue that they are entitled to relief under the theory of negligence per se. They claim that Defendants violated various FDA regulations and that these violations constitute a breach of the duty that the Defendants owed them. Essentially, this argument attempts to shift the nature of the duty owed. As explained above, the learned intermediary doctrine absolves Defendants of any duty to warn the plaintiffs. Instead, Defendants' bear the duty to adequately instruct and warn physicians, who then act as learned intermediaries, schooling the patients about the risks and rewards of Meridia. Yet, attempting to establish negligence on the basis of defendants' failure to follow FDA labeling regulations implicitly assigns an additional duty upon defendants-the duty to warn individual consumers. Setting aside the potential impropriety of permitting Plaintiffs this extra bite at the same apple,[23] the Court considers Plaintiffs' negligence per se claim.

The Court rejects Plaintiffs' negligence per se claim because Plaintiffs fail to set forth any violation of a law or regulation. Plaintiffs note that FDA regulations require a drug label to "contain a summary of the essential scientific information needed for the safe and effective use of the drug," 21 C.F.R. Sec. 201.56(a) (2004), and that the label must be "informative and accurate and neither promotional in tone nor false or misleading in any particular," *Id.* at 201.56(b). Further, Plaintiffs parrot the language of 21 C.F.R. § 201.57(e): "The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with the drug; a causal relationship need not have been proved." However, Plaintiffs offer no evidence that Defendants ever violated any of these regulations. They note that Defendants' European label contained more information than their American label, but fail to explain how this disparity violates the FDA regulations. Additionally, none of Plaintiffs' experts testify that the Meridia label violates federal labeling regulations. Because Plaintiffs offer no evidence in support of their negligence per se claims, the Court **GRANTS** Defendants' motion for summary judgment on these claims.

## IV. Breach of Warranty

Plaintiffs also argue that Defendants breached both the express and implied warranties associated with Meridia. "To prevail on a warranty theory in a products liability case, a plaintiff must show not only the existence of a warranty, but also that the warranty was broken and that the breach was the proximate cause of the

---

**23.** The Supreme Court of Illinois recognized this impropriety in *Martin v. Ortho Pharmaceutical Corp.*, 169 Ill.2d 234, 214 Ill.Dec. 498, 661 N.E.2d 352 (1996). There, the court held that because Illinois law recognizes the learned intermediary doctrine, plaintiffs could recover for violations of federal regulations only if the federal courts have recognized a private right of action under those regulations. Because federal courts determined that no private right of action exists under the Food, Drug, & Cosmetics Act ("FDCA"), plaintiffs were unable to recover for violations of regulations promulgated pursuant to the FDCA. *Id.* at 242, 214 Ill.Dec. 498, 661 N.E.2d 352.

harm sustained." *Fellows v. USV Pharm. Corp.,* 502 F.Supp. 297, 299 (D.Md.1980). The Court considers Plaintiffs' express and implied warranty claims below.

## A. Express Warranties

Plaintiffs argue that the Defendants' assurances that "Meridia is safe and effective" in their advertising created express warranties regarding the drug. Under Ohio law, express warranties include "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation of promise." Ohio Rev.Code 1302.26(A)(1). Given this definition, it is not clear whether advertising indicating that a particular product is "safe and effective" would suffice to create an express warranty. Other jurisdictions, however, have held that advertisements are sufficient to create express warranties. *See, e.g., Keith v. Buchanan,* 173 Cal.App.3d 13, 220 Cal.Rptr. 392, 396 (1985) ("It is clear that statements made by a manufacturer or retailer in an advertising brochure which is disseminated to the consuming public in order to induce sales can create express warranties."); *see also Community Television Services v. Dresser Industries,* 586 F.2d 637, 640 (8th Cir.1978) (cited in *Keith* ); *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364, 370–71 (E.D.Mich.1977) (same). Rather than undertake an analysis under the laws of all fifty states, the Court presumes for purposes of this case that advertisements are sufficient to create express warranties. Regardless, Plaintiffs' claims cannot survive.

■ First of all, asserting that a product is "safe and effective" is not sufficiently clear to create an express warranty. In *Delta Marine, Inc. v. Whaley,* 813 F.Supp. 414 (E.D.N.C.1993), the court granted summary judgment to the defendant on a breach of express warranty claim because an alleged statement that product would "do a good job" was not sufficient as a matter of law to create an express warranty. *Id.* at 420. Indeed, in cases involving drugs, courts have held that more specific statements were insufficient to create express warranties. For instance, in *Whittington v. Eli Lilly & Co.,* 333 F.Supp. 98 (S.D.W.Va.1971), the court found no express warranty despite statements that the birth control pill the defendants manufactures was "virtually 100% effective." *Id.* at 100. Similarly, in *Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir.1969) the court found that express warranty claims were not suitable to go to the jury where the product label warned of possible damage to the eyes and where the "defendant did not represent either (1) that its drugs were free from all harmful side effects or (2) that its drugs were absolutely harmless." *Id.* at 428. For these reasons, the Court finds assurances that Meridia is "safe and effective" insufficient to create an express warranty.

■ More importantly, even if Defendants' advertisements regarding Meridia did create an express warranty, Plaintiffs have not come forth with evidence that Defendants breached the warranty. Plaintiffs have produced no evidence that Meridia causes harm other than the Defendants' own admission that Meridia can cause substantial increases in blood pressure and the earlier-described article's finding that some studies show that Meridia elevates blood pressure. An increase in blood pressure, in and of itself, is not a compensable injury because it does not create a loss or detriment. It therefore does not fall within the *Restatement (Second) of Torts'* definition of "harm." *See* RESTATEMENT (SECOND) OF TORTS § 7.

819

Plaintiffs also fail to come forward with evidence tending to establish that Meridia is ineffective for treatment of obesity. Plaintiffs dispute the results of the STORM Study, a clinical trial showing the most dramatic weight loss results. However, Plaintiffs have not offered any contrary evidence tending to establish that Meridia is an ineffective weight loss agent. Further, there is no proof that Defendants guarantee Meridia patients the same weight loss results as those found in the STORM Study. *See, infra,* Section VII. Ultimately, Plaintiffs do not produce sufficient evidence to support the conclusion that Meridia is not "safe and effective." Therefore, the Court **GRANTS** Defendants' motion for summary judgment on plaintiffs' breach of express warranty claims.

### B. Implied Warranties

Plaintiffs also seek to recover for breach of implied warranties, presumably the implied warranty of merchantability and the implied warranty of fitness for a particular use. These claims, too, fail. Courts have held that where comment k to the *Restatement (Second) of Torts* § 402A bars recovery under a strict liability theory, causes of action for implied warranties are likewise unavailable. *See, e.g., Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 417–18, 426, 751 P.2d 470 (1988); *Miles Labs., Inc. v. Doe,* 315 Md. 704, 556 A.2d 1107, 1123 (1989); *Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775 (R.I.1988). Under comment *k,* unavaoidably unsafe products such as drugs are neither defective nor unreasonably dangerous, so long as they are "properly prepared and accompanied by proper directions and warning." *Restatement (Second) of Torts* § 402A cmt. k. Because the Court already has concluded that Defendants' warnings were adequate, the comment *k* defense applies and bars recovery under the breach of implied warranty the-

ory. The Court therefore **GRANTS** defendants' summary judgment motion on these claims, as well.

### V. Fraud, Misrepresentation, State Consumer Protection Statutes

Further, Plaintiffs allege that defendants have negligently and fraudulently misrepresented the safety and effectiveness of Meridia, in violation of both common law and statutory law. Responding, Defendants assert that Plaintiffs have failed to create a material issue of fact with regard to these claims due to insufficient causation evidence.

### A. Elements of the Claims

Before delving into the substance of the arguments, the Court first sets out the elements of the legal claims at issue. "The text book elements of a fraud action are: (1) false representation of a material fact; (2) knowledge of or belief in its falsity by the person making it; (3) belief in its truth by the person to whom it is made; (4) intent that it should be acted upon; and (5) detrimental reliance upon it by the person claiming to have been deceived." 5 Wright and Miller, *Federal Practice and Procedure,* § 1297 (2d. ed.1990) (internal citations omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 525.

Meanwhile, the elements of negligent misrepresentation generally mirror those of fraud, except that a complainant need not show intent or recklessness on the part of the offending party (scienter). The *Restatement (Second) of Torts* defines negligent misrepresentation as "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions" and "fails to exercise reasonable care or competence in obtaining or communicating the

information." RESTATEMENT (SECOND) OF TORTS § 552. It is notable that some states impose liability upon a seller for negligent misrepresentation only if there existed a "closer degree of trust and reliance than that of the ordinary buyer and seller." *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808 (1976).

 Finally, Plaintiffs allege a violation of state consumer protection statutes.[24] Such statutes have their roots in the common law tort of fraudulent misrepresentation. The vast majority of states have enacted deceptive trade practice and consumer protection statutes.[25] Generally, these statutes "make it unlawful to use or otherwise engage in unfair or deceptive acts or practices in the conduct of trade or commerce." Donald M. Zupanec, *Practices Forbidden by State Deceptive Trade*

*Practice and Consumer Protection Acts*, 89 A.L.R.3d 449, *2a (1979) (updated Mar. 2004). States diverge in their definitions of "unfair or deceptive acts." Some states statutes are broader than common law; others limit liability to acts or practices actionable at common law. *Id.* at *2a. Further, states disagree regarding whether the intent to deceive is a necessary element of the claim, *id.* at *4, and whether the statutes are limited to acts that affect the public interest. *Id.* at *2a, *3d.[26]

## B. The Safety and Efficacy of Meridia

With regard to the safety of Meridia, Plaintiffs allege that Defendants did not sufficiently reveal the negative side effects of Meridia in their labeling, package inserts, marketing, and communications with physicians. Recall that Plaintiffs have failed to create a material issue of fact regarding their assertions that Meridia

---

24. The claim for violation of state consumer protection alleged in master class action complaint states:

130. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of any and all state consumer protection statutes when they represented, through their advertising, warranties, and other express representations, that Meridia had benefits or characteristics that it did not actually have. Defendants further violated state consumer protection statutes when they falsely represented that Meridia was of a particular standard or quality when it was not. Finally, Defendants violated state consumer protection statutes when they advertised Meridia with the intent not to se[l]l it as advertised, and when, in so doing, they concealed and suppressed facts material to the true characteristics, standards, and quality of Meridia.

131. Defendants' deceptive practices were specifically designed to induce Plaintiffs and the Classes to buy Meridia.

132. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Classes have suffered actual damages and members of the

Classes are threatened with irreparable harm by undue risk of physical injuries or death.

(Master Class Action Compl. at ¶¶ 130–32).

25. Donald M. Zupanec, *Practices Forbidden by State Deceptive Trade Practice and Consumer Protection Acts*, 89 A.L.R.3d 449, *2a (1979) (updated Mar. 2004); Dag E. Ytreberg, *Legislation Protecting Consumers Against Unfair or Deceptive Trade Practices*, 17 Am.Jur.2d. § 280 (2003). "Generally speaking, the states have modeled their legislation on the Federal Trade Commission Act, or have adopted the Uniform Consumer Sales Practice Act or the Uniform Deceptive Trade Practices Act or based their statutes thereon." 17 Am.Jur.2d. § 280.

26. At this stage, the Court does not find it necessary to examine the consumer protections available to consumers in all fifty states. It is well-settled law that, when a particular issue raised by a motion for summary judgment depends upon generally applicable statements of law, the MDL court need not engage in a choice of law analysis to resolve the summary judgment motion. *See, e.g., TMJ Prods. Liab. Litig.*, 113 F.3d 1484, 1488–89 (8th Cir.1997).

causes injuries other than those related to increased blood pressure. Thus, at this stage, the Court will examine only the existence of fraud, misrepresentation, or deceptive sales practices with regard to Meridia's capacity to cause increased blood pressure. However, Defendants provided conspicuous warnings about Meridia's ability to cause substantial increases in blood pressure in the product information provided to both physicians and patients.

▮▮▮ Plaintiffs argue that Meridia sales representatives were not adequately trained to discuss the drug and that they gave instructions to physicians which "watered down the warnings as to make them not effective[.]" (Pl. br. at 42). Although Plaintiffs make vague assertions that Defendants were not forthright about the risks of the drug in their consumer advertising and physician contacts, Plaintiffs do not point to any statements where Defendants misrepresent Meridia's ability to cause increased blood pressure. Thus, with regard to the risks associated with Meridia, Plaintiffs do not create a material dispute of fact as to their claims of fraudulent misrepresentation, negligent misrepresentation, and unfair or deceptive sales practices.

With regard to the efficacy of Meridia, Plaintiffs allege that Defendants have embellished (1) the duration one ought to remain on Meridia, (2) Meridia's ability to cause weight loss, and (3) Meridia's effectiveness in treating metabolic syndrome. Plaintiffs allege that through an aggressive marketing campaign involving television advertisements, internet websites, newsletters, toll-free telephone numbers, coupons, and direct mailings, Defendants have misled consumers regarding the efficacy of Meridia. (Pl. br. at 18). In 2000, Plaintiffs claim that Abbott spent over $65 million to promote Meridia directly to consumers. *Id.*

▮▮ First, Plaintiffs assert that Defendants misrepresent the duration of time during which a patient should remain on Meridia. It is undisputed that a patient who does not respond to Meridia within the first month is unlikely to see results on the medication. The package insert states:

80% of patients who do not lose at least 4 pounds in the first 4 weeks of treatment with a given dose of MERIDIA do not lose at least 5% (placebo-subtracted) of their initial body weight by the end of 6 months to 1 year of treatment on that dose. If a patient has not lost at least 4 pounds in the first 4 weeks of treatment, the physician should consider reevaluation of therapy which may include increasing the dose or discontinuation of Meridia.

(Package Insert, Def. Response at Exhibit 2). Regardless of this warning, Plaintiffs assert that Defendants misrepresent the efficacy of the drug by encouraging doctors to keep patients on Meridia for up to 100 days. Indeed, part of the marketing plan for Meridia did include telling physicians to maintain patients on a course of therapy. Nevertheless, there is no evidence that Defendants gave these instructions to physicians with regard to nonresponders:

Q. And do your sales reps talk to physicians as part of their presentation about nonresponders?

A. Absolutely.

Q. What do they tell physicians about nonresponders?

A. Patients who lose 4 pounds in the first month will more than likely be responders. And those who have not lost four pounds in the first week—first four weeks should continue if in the mind of the physician a higher dose might have an effect and so they would then move them

up to 15. If after 8 weeks he still sees no change then he's definitely a nonresponder and would not merit continuation of therapy.

(Lavji Dep. at 123–24; Def. Reply Br. at Exhibit 123). Ultimately, Plaintiffs are unable to create a material dispute of fact regarding whether Defendants misrepresented the recommended length of therapy.

Second, Plaintiffs claim that Defendants have exaggerated Meridia's effectiveness in causing weight loss. In particular, Plaintiffs take issue with the fact that "since September, 2001 Defendants have consistently promoted Meridia as delivering 'significant weight loss at six months and successful weight maintenance at 24 months,' with a 'mean 26 lb. lost at six months.'" (Pl. br. at 27). Defendants derive these figures from the STORM Study, explained in more detail below. Zahir Lavji, an employee of Abbott Laboratories since 1989, confirmed this sales strategy:

Q. Do you know how the Storm trial has been used in the marketing of Meridia during the time you've been vice president and general manager?

A. Yes.

Q. How has it been used in the marketing of Meridia?

A. It is [sic] the efficacy and safety from it is in some of our educational materials.

Q. Do you know what the sales reps are telling the doctors about the results of the storm trial in their sales calls?

A. That you lose 26 pounds in 6 months.

(Lavji Dep. at 39–40).

In their sales presentations to physicians, Defendants often reference the findings of the STORM Study. For example, a guide that Meridia sales representatives provide to physicians begins with the headline: "STORM Study: Significant weight loss at 6 months." On the first page of the guide, a big, pulled quote proclaims: "Mean 26 lb. loss at 6 months." (Def. reply br. at Exhibit 130, ABTE 498949).[27] Direct-to-consumer marketing made similar claims, but did not cite the STORM Study. One ad boasts: "Combined with a reduced-calorie diet and regular activity, MERIDIA can help you lose about a pound a week." (ABTE 296045).

Plaintiffs allege that the STORM study is severely flawed and that Defendants ignore other studies which show less weight loss. The Sibutramine Trial of Obesity Reduction and Maintenance ("STORM") Group conducted the STORM Study and published the results in a medical journal. *See* W.P.T. James, et al., *Effect of Sibutramine on Weight Maintenance after Weight Loss: a Randomised Trial*, The Lancet, Vol. 356, No. 9248 at 2119–25 (Dec. 23/30 2000) (Exhibit 26). The study examined the weight loss of patients over six months and the maintenance of the weight loss over the subsequent eighteen months. During the initial weight loss phase, 605 participants ingested 10 milligrams of sibutramine (Meridia) a day and followed a diet and exercise program. Approximately 138 participants dropped out of the study during the weight loss phase. Of those to remain in the study during the initial six month period, the mean weight loss was twenty-six

27. A footnote explains the parameters of the study, tacitly notifying physicians of any limitations of the study.

pounds. Nevertheless, during this initial six month period, the study lacked a control group of participants who followed the diet and exercise program, but did not ingest Meridia. Thus, the study did not differentiate between the benefits of a diet and exercise program and the marginal benefits of ingesting Meridia.

During the weight maintenance phase of the STORM study, the trial divided the participants into two groups—the Meridia group (sibutramine, diet, and exercise) and the control group (placebo, diet, and exercise). At the end of an eighteen-month period, the Defendants touted the results of the trial as indicating that the Meridia group was more likely to maintain their weight loss. Yet, the Meridia group increased the amounts of Meridia they ingested if they began gaining weight; many ingested doses not approved by the FDA. Plaintiffs point out that "more than 52 percent of the STORM Study patients (those who gained more than 2.2 pounds) were given 20 mg of Meridia, which dosage has not been approved and is not available for purchase." (Pl. br. at 28–29). Additionally, significant numbers of patients withdrew from the study: "148 Meridia and 58 placebo patients dropped out of the study" during the weight maintenance phase. Ultimately, of the 605 participants that originally enrolled in the study, 261 completed the study. (Lavji dep. at 38).

Plaintiffs claim that a mean of 26 pounds lost is an anomalous result. Plaintiffs point out that "STORM Study patients were very obese, with body mass indices ['BMIs'] of between 40 and 45. Meridia, however, is targeted to much smaller obese people (with BMIs of greater than or equal to 27)." (Pl. br. at 29) (internal citations omitted). Plaintiffs argue that,

with a more typical sampling, most studies show that the average person on Meridia is likely to lose 11 pounds, not 26. (Seaton Dep. at 222; Shepherd Dep. at 71). Defendants counter that the STORM study was published in a prestigious medical journal and that it is not an atypical study.

 Regardless of the circumstances surrounding the study, Plaintiffs are unable to create a material dispute of fact with regard to their common law fraud and misrepresentation claims. Plaintiffs have not offered evidence tending to establish that Defendants made false statements with regard to Meridia's ability to cause weight loss. While Plaintiffs may object to the procedures used in conducting the STORM Study, the results of the study do indeed reflect a mean of twenty-six pounds lost over six months. Defendants' discussion of the results of the study does not constitute a material misrepresentation. Furthermore, in their literature, Defendants explain all of the above limitations of the study—including the lack of a control group in the initial phase of the study and the participants who withdrew from the study.[28]

Next, the Court must determine whether Plaintiffs may proceed with claims under state consumer protection statutes, given that some statutes grant rights broader than those actionable at common law. Massachusetts law lays out one of the most lenient standards for establishing a state consumer protection claim:

> Chapter 93A proscribes "those engaged in trade or commerce from employing '[u]nfair methods of competition and unfair or deceptive acts or practices' in business transactions." *Commercial Union Ins. Co. v. Seven Provinces Ins.*

---

28. The Court does not address whether Defendants' waived their argument, based on Federal Rule of Civil Procedure 9(b), that Plaintiffs failed to plead their fraud claims with particularity. The point is moot because the Court finds that Plaintiffs did not create a material dispute of fact with regard to their claims of fraudulent misrepresentation.

*Co.*, 217 F.3d 33, 40 (1st Cir.2000) (quoting Mass. Gen. Laws ch. 93A, § 2). The standard for behavior that falls within the ch. 93A proscription is notably imprecise, encompassing any actions that "attain a level of, rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce, have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *Id.* (internal quotations and citations omitted).

*St. Paul Fire and Marine Ins. Co. v. Ellis & Ellis*, 262 F.3d 53, 66 (1st Cir.2001) (citations omitted).

Similarly, the Florida Deceptive and Unfair Trade Practices Act, FLA STAT. ch. 501.201 *et seq.*, prohibits "unfair or deceptive acts or practices," but does not require proof of a finding of fraud. The statute does not define the terms "unfair or deceptive." Nevertheless, a Florida appellate court noted that state consumer protection statutes clearly prohibit "exaggerated advertising claims." *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451, 453 (Fla. 1st DCA 1985). Furthermore, the Florida statute expressly defers to the meaning of terms in the Federal Trade Commission Act. § 501.204(2). As a result, a Florida appellate court cited with approval the federal definition of a practice as being "unfair" when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (quoting *Spiegel, Inc. v. Federal Trade Comm.*, 540 F.2d 287, 293 (7th Cir.1976)).

Even given these broad definitions of unfair or deceptive practices, Plaintiffs fail to create a material dispute of fact with regard to their state consumer protection claims. Plaintiffs have not pre-sented evidence of exaggerated advertising or otherwise immoral marketing of Meridia. When Plaintiffs cited the results of the STORM Study, they acknowledge the limitations of the study. For example, in one visual aid provided to physicians, Defendants noted the average Body Mass Index ("BMI") of the individuals participating in the study, the amounts of Meridia the participants consumed, the numbers of participants who completed the study, and the scope of the control group. (ABTE 498948).

Furthermore, Plaintiffs have not presented evidence that Defendants promised weight loss results of twenty-six pounds in six months to consumers. In fact, in their direct-to-consumer advertising, Defendants vaguely state that "[c]ombined with a reduced-calorie diet and regular activity, MERIDIA can help you lose about a pound a week." The parties do not dispute that one may lose about a pound a week during the first month of ingesting Meridia; this advertisement makes no claims that weight loss will continue at this rate for six months. Furthermore, Defendants do not guarantee substantial weight loss, but instead use the conditional word "can." Lastly, Defendants note the necessity of diet and exercise as part of a weight loss plan. Ultimately, Plaintiffs fail to offer sufficient evidence tending to establish that Defendants somehow exaggerated the ability of Meridia to cause weight loss.

Lastly, Plaintiffs argue that Defendants misrepresent Meridia's ability to treat metabolic syndrome. Metabolic syndrome is a "constellation of symptoms" clustered in one patient, including abdominal obesity, high triglycerides, low HDL cholesterol, elevated fasting blood glucose, and elevated blood pressure. (Lavji Dep. at 158). "[A] very large degree of obese patients have this constellation of co-morbidities which are essentially classified as metabolic syndrome[.]" *(Id.* at 162).

There is scant evidence that Defendants have marketed or promoted Meridia for treatment of metabolic syndrome.[29] Further, Plaintiffs have not pointed to any false, deceptive, or misleading statements that Defendants made with regard to metabolic syndrome. Indeed, the article Plaintiffs provide suggests evidence that Meridia may have slight beneficial effects on fasting blood glucose, HDL cholesterol, and triglyceride levels. Arterburn, et al., *The Efficacy and Safety of Sibutramine*, at 1001. Plaintiffs may argue that Defendants exaggerate Meridia's ability to treat the weight gain aspect of metabolic syndrome. Nevertheless, for the reasons described above, Plaintiffs fail to create a material dispute of fact that Defendants misrepresent the efficacy of Meridia. For all of the reasons stated above, the Court **GRANTS** Defendants' motion for summary judgment with regard to Plaintiffs fraud, misrepresentation, and state consumer protection claims.

## VI. Medical Monitoring

Plaintiffs also bring a claim for medical monitoring. "Medical monitoring, as an independent cause of action or as an element of damages, allows an individual to recover costs associated with diagnosing and testing for illnesses that have yet to develop." James F. Rogers, ed., *50 State Survey of Medical Monitoring*, 2001 A.B.A. Sec. of Litig. Rep., at intro. Courts are split in determining whether medical monitoring is a cause of an action or an element of damages. *Id.* Defendants claim that, even if medical monitoring is a cause of action, Plaintiffs have not established a material dispute of fact with regard to that claim.

Those jurisdictions which do recognize medical monitoring as a cause of action typically require proof of:

(1) Significant exposure to a hazardous substance;

(2) as a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease;

(3) a monitoring procedure exists that makes the early detection of the disease possible;

(4) there is some clinical value in early detection and diagnosis of the disease.

*See e.g., Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1009, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993); *Petito v. A.H. Robins Co., Inc.*, 750 So.2d 103, 106–07 (Fla.Dist.Ct.App.1999); *Bourgeois v. A.P. Green Indus., Inc.*, 716 So.2d 355, 360–61 (La.1998) (In 1998, Louisiana Civil Code Article 2315 required evidence future medical treatment or surveillance is "directly related to a manifest physical or mental injury or disease." La. Civ.Code Ann. art. 2315); *Redland Soccer Club, Inc. v. Dep't of the Army*, 548 Pa. 178, 696 A.2d 137, 145–46 (1997).

 Plaintiffs have failed to create a material dispute of fact as to their medical monitoring claim. As described above Plaintiffs have created an issue of fact whether Meridia causes substantially increased blood pressure while consuming the drug. However, Plaintiffs have offered scant evidence tending to establish that high blood pressure, for the period Plaintiffs were on Meridia, significantly increases Plaintiffs' chances of contracting a disease.[30] Further, Plaintiffs have not es-

---

**29.** One sales aid, shown to physicians, makes reference to metabolic syndrome. However, it appears that Defendants only promote Meridia as effective in treating the weight gain aspect of metabolic syndrome. (ABTE 498956–57). There is little indication that the drug was marketed to treat off-label uses.

**30.** The most compelling evidence in the record is a statement from Jeffrey Borer, M.D.:

tablished that the effects of Meridia last after one has stopped consuming the drug. Even if Plaintiffs could show that Meridia significantly increased one's risk of disease while consuming Meridia, they cannot show that the risk of disease continues after one has stopped taking the drug.

Defendants point out that Meridia's effect on the body ceases shortly after the patient stops taking the drug. (Def. Reply Br. at 46). Plaintiffs have offered no evidence to the contrary. Thus, Plaintiffs are unable to establish that they have an "increased risk" of suffering from future disease so that they would benefit from medical monitoring. Ultimately, Plaintiffs have not created a material dispute of fact regarding a key element of the medical monitoring claim. As a result, the Court **GRANTS** Defendants' motion for summary judgment with regard to this claim.

### CONCLUSION AND ORDER

For the foregoing reasons, the Court **GRANTS**, in part, Defendants' motion to exclude the expert testimony of Arnold Schwartz, Ph.D. and **DENIES** as moot Defendants' motion to strike the affidavit of Keith Altman. Ultimately, the Court **GRANTS** Defendants' motion for summary judgment, dismissing all of Plaintiffs'

claims against the Pharmaceutical Defendants. Plaintiffs also bring claims against the treating physicians who prescribed Meridia ("Physician Defendants"). At this juncture, the claims against the Physician Defendants continue to pend.

IT IS SO ORDERED.

---

You know, an increase—the current estimate is that an increase in blood pressure of 20 millimeters of mercury in systole, peak systole, or 10 millimeters of mercury in diastolic, an increase of that magnitude doubles the cardiovascular risk over time if that happened to somebody and that risk doubling begins at the baseline blood pressure of 115 over 75 which is well within the acceptable range.

When one hears that [the results of a study] that is a concern. When you look and see that the study, in the analysis in which it was observed, and again I am doing this from memory, I can't tell you what page it appears on, that somewhere between 15 and 20 percent of people on Meridia had an increase in diastolic pressure sustained in several consecutive visits

of grater than or equal to 10 millimeters of mercury, that is a concern.
(Borer Dep. at 119). Yet, Plaintiffs present no evidence that Meridia causes blood pressure increases anywhere near this magnitude. The closest they come is their citation to Arterburn, et al.'s *The Efficacy and Safety of Sibutramine.* As previously noted, the article reports that one study showed an increase of 4.4 mm Hg systolic over 3.3 mm Hg diastolic for Meridia patients. Subtracting the corresponding blood pressure increases experienced by subjects taking a placebo (0.2 mm Hg / 0.5 mm Hg), that study showed that Meridia was associated with a net blood pressure increase of 4.2 mm Hg over 2.8 mm Hg. *Id.* at 1000. Such an increase is several orders of magnitude beneath the risk doubling increase that Borer cites.